We're going to have a bifurcated presentation. Ms. Helm, can you hear me? You're in remote there, and I can see you well enough. Can you hear me? Yes, Your Honor. I can hear you fine. Can you hear me? Yes, ma'am. That's fine. And we have Mr. J. You're going to be arguing here in the courtroom for Novartis? That's correct, Your Honor. OK. Well, why don't we hear from Ms. Helm then and begin? Thank you, Your Honor. And may it please the court, I'm Katherine Helm from Deckert representing Eli Lilly and Company Entities as appellants here. This case concerns the resides or is found language in 28 USC 1782 that permits district courts to order discovery for use in foreign proceedings. The district court below found it lacked jurisdiction and reversed the magistrate to vacate Eli Lilly's 1782 application and in doing so committed reversible error for at least three reasons. The first error is that 1782 requires or is found language was held to require a physical presence of the entity from which discovery is sought and that under this construction, then Novartis was not found in the Eastern District of Virginia. And third, that Lilly's 1782 application should be denied based on the Supreme Court's intel factors. Now, before presenting our views on why the statutory interpretation was wrong and thus the application flowing therefrom was also wrong, I'd just like to present two sort of overarching themes that we think encapsulate the errors here. And the first one is that Novartis paints a broad brush stroke, ironically, to say that Lilly is reading a section 1782 too broadly overall without any specificity as to the word found. But because Congress chose some broad terms, it must have wanted every term in the statute construed broadly, and that's not so, and we'll explain why that's not our position. Courts have consistently interpreted found in other statutes broadly, not just 1782, and have cautioned specifically in the case of 1782 not to engraft these atextual limits on it. The second major theme is that Lilly's position is that Novartis relies on what it jurisdiction law that is outdated, no longer correct, and ignores current law, statutory principles, and that this infects both the construction and the application of its argument that found requires this physical presence of an authorized agent in the district. Novartis relies on old cases, old academic commentary that were both pre- Let me address the jurisdictional notion. I can tell you that I personally have a lot of trouble equating found with a jurisdictional notion. It seems to me they're totally different concepts, and it didn't look like Congress was extending found in 1782 to the jurisdictional limits under the due process clause that governed jurisdiction. And so you can try to make the argument and I'll listen, but I think that the jurisdictional reach is broader than being found. I don't mind interpreting found and hearing the full arguments on it, but I must say, if we get into the whole notion of, I mean, we have both Calder and Burger King where it says you don't have to be present there, you don't have to be found there. It's a jurisdictional reach under, especially involving electronics now is remote. It's a concept that is different, and I think far broader than the word found. Now, that doesn't mean I've reached any firm conclusion about what found might mean, but I must say my colleagues can take up their own positions on this, but I don't find a whole argument directed at jurisdiction to be helpful to myself. Okay. Thank you for that, Your Honor. I think we agree that Burger King and other cases hold that the sort of antiquated notions that we might otherwise attribute to a word like found in a statute like 1782. They didn't address found. That's my point. In other words, it's not a helpful lane. They are talking about fairness and the reach of a sovereign beyond the state lines, and they have addressed it in many different contexts, and the courts now are addressing the extent to which you market over the internet and direct your attention to a particular state. You've never been there. You have no property there. You have no agents there. There can be jurisdiction there, though, under the due process clause, but Calder is one of the typical ones that's really out there pretty far out, I think, but Burger King made the point explicitly, and I don't think we're using different language. We're using different concepts. Here in 1782, Congress said that it almost looks more like a venue provision that you can use 1782 where the person from whom you're seeking the information, where the person is found. But you can argue it, but I can tell you I don't find the jurisdictional language and discussion useful. It's much broader. Okay. Well, why don't we go to what... Look, don't... You know, you make your judgment call. I got two colleagues here who are just much smarter than I am, and they may be on the other side of that. Well, let me try and temper this for both of you. I think our position is that the found analysis, the jurisdictional analysis of found, really does import a lot of the sort of fairness considerations inherent in the question of venue and sort of what is a requirement for Congress's usage of found, and we could go to venue statutes to exemplify that. Ms. Hamm, don't we have to... Don't you have to have personal jurisdiction over Novartis regardless of what the correct meaning of found is? Because you got to have jurisdiction to issue the enforcers' subpoena. You do have to have personal jurisdiction over Novartis as a statutory matter for found. You also, since 1782, mandates that the statute and the discovery obligations therein are carried out through the federal rules of civil procedure that extends to nationwide service over Novartis. So in this particular case, for example, the subpoena that was granted from the application and issued and properly served on Novartis as an entity was served on an officer and director of Novartis in a different district and nothing in the rules or the statute require that that service be in the same district in which Novartis is found for purposes of the 1782 statute. And in this particular case, it wasn't. Were they served in Chicago? Was that it? Correct. Yes, she was served in Chicago and accepted service there. And under our line of cases, which we can get into, Novartis raises in several different aspects of its argument this point of where documents are located. And the district court also, we think, erroneously relied on that and sort of took up the week we're calling it the extraterritoriality point that was addressed in the DelVal ruling and elsewhere. And our position on that is that extraterritoriality in the actual location of the documents is not at issue here. It's not properly before this court. We should look to the federal rules for those implementations and the standard rules that apply in Federal Rules 34 that sort of possession, custody, or control test of documents. And one of the emblematic ways in which documents can be found or documents can be produced is if they are pursuant to a director or officer speak on behalf of the company having access to those documents, which we believe... I think what Judge Floyd was getting at, and I guess he can correct me if I'm wrong, is that let's assume that we agree with you that found extends beyond the actual physical presence in a particular district or jurisdiction, but extends to the limits of personal jurisdiction. The district court in this case determined that given the facts of this case, including the fact that the only contact that Novartis had with the Eastern District of Virginia was a patent proceeding that was simply pending, had not received any patents at the time, and that that result wouldn't extend beyond the limits of the U.S. in any event, even though tangentially related to the overseas litigation, that that simply wasn't enough. And so that's sort of the rug here, isn't it? What's wrong with that ruling? Certainly. Thanks for the clarification. So if we're assuming that found is met as a statutory matter, I think the question is, was the test met here for Novartis in the Eastern District of Virginia? And we believe it was because of three specific reasons. And the first one is that the characterizations of Novartis having one proceeding in the U.S. Patent Office that's tangentially, only tangentially related to a European patent infringement action abroad is simply not accurate. Our position here is that Novartis engaged substantively with all of the adjectives required for this fairness analysis in the Patent Office, you know, intentionally targeted, directed, ongoing activities to purposefully avail itself of those rights of the Patent Office, that that creates the significant connection between the discovery that Lilly is seeking in the 1782 application for the underlying controversy, which involves far more than one patent infringement dispute  It involves competition, defenses, and claims that relate directly to Novartis' activities, and I'd be happy to go through how each one of our discovery requests directly tie to that. And we believe the district court erred significantly by entirely ignoring the pending competition law, defenses, and claims in this action. As you recall, the district court focused on and characterized the proceeding abroad as one patent infringement action. The district court also focused on pending or a potential European filings of complaints and used language that such potential complaints might be no more than a twinkle in the eye and not sufficient to rise to having jurisdiction over Novartis for its actions here, and those are simply not accurate. The facts here are rather atypical, and that's what leads to such a strong connection between what Novartis has done in the Patent Office and what Lilly is asserting in terms of fairly broad-sweeping global antitrust claims. And the controversy includes... I should say the controversy includes discovery requests that directly ask about and relate to particular acts, and those acts include the acquisition of a portfolio, which included at the time the potential for a U.S. patent, as well as the rights to U.S. applications flowing from that patent. And we have a request specifically directed to that, including filings made before the Patent Office, as well as U.S. that's request number four. This is all at the Joint Appendix 54. The subpoena itself is reproduced several times in the Joint Appendix, but that's the earliest one. There are also requests directed to the U.S. proceedings, as I said, that's request number seven. Valuation, including the U.S. patent, which was formed as a part of the valuation and which Lilly did not know at the time when it originally sought its application, but has since learned and bolstered that, and that was one of our requests. And all part of this discovery was geared towards getting at conduct that impacts competition on a global scale. And Judge Davis below correctly noted this when his summary of the application and granted it on that basis was he said, Novartis conducted itself in such a way to utilize the USPTO as a conduit through applications and other conduct that would give them a footing to remove competition concerning their product. Now, what Novartis is doing on a global basis could be used by Lilly to argue in their various pending complaints. Novartis attempts to preserve its own dominant market position and the U.S. is the largest market, and Novartis has made admissions, as we cited in our reply brief, which were made subsequent to the District Court's decision, so the District Court didn't have the benefit of this, but Novartis specifically raises that Lilly's ability to practice the patents from Novartis may also include patents that have not yet issued or that may issue in the future, for example, pending U.S. applications. Now, there is a body of antitrust law that gets at the potential for assertion of not only existing patents, but potential future patents and invalid patents, and Lilly has done several steps to counter this in the U.S., in the U.S., I should say, including filing a grievance between the Office of Enrollment and Discipline, and that is in the record as well, that details Novartis' conduct, and it's simply incorrect the way Novartis has characterized it to say that it is no more than a handful, or in fact they say two set of filings that include recordation of assignment and three patent applications of ministerial consequence. That's simply not true in the record, and we can directly rebut that by now we have the purchase agreement that was made between Genentech, the party that sold this patent portfolio at issue, and Novartis that bought it. That purchase agreement begins at Joint Appendix 547. There are redacted portions of it, but there are significant portions that are not redacted, and I would just like to point you to a couple of them that directly speak to patent assignments, patent recordations, and delayed assignment agreements. And the agreement, insofar as what is public that we can discuss, is that the acquisition of this portfolio contemplated the timing and structure and sequence of filing patent assignments as part of an anti-competitive scheme to remove Lilly from the market and to do things like give Novartis standing in Europe to file for certain claims, including seeking preliminary injunctions. Lilly's direct... Yeah, I think you can pick up on this if you wish on rebuttal, but I think we've gone over the time here a fair amount, and so why don't we give Mr. Jay a chance here. Certainly, Your Honor. Thank you for the time. Yeah. All right. Mr. Jay. Thank you, Your Honor. May it please the Court. The District Court got all three of its conclusions right, and this Court can affirm on any of them or all of them. I'll go wherever the Court takes me, but without... And discuss why they don't get over that first hurdle because Novartis Pharma AG is not found in this district, and then I'll touch on the other two issues of specific jurisdiction and the intel factors. But as we said, any of those would be sufficient basis to affirm. The correct interpretation of the word found is not that it means the limit of due process. A company is not found in any district where due process would allow it to be subject to suit. Found had a definite meaning at the time this statute was enacted, and Lilly's definition is not supported by anything in the statute, in the structure, in the dictionaries, or in the case law that was on the books at that time. So we think that the District Court got it exactly right by concluding that a company to be found in a district, I'll just put it colloquially, has to be found there for service of process. There has to be a presence or an agent who can be served. We think that's what this Court should hold if you reach the statutory question. I recognize that there's a lot of history and that personal jurisdiction doctrine certainly has changed since 1948. But the other side sort of uses international shoe as a stand-in for what they think the word found means. Now, international shoe doesn't construe the word found. This is the point that Judge Neumeier made in his colloquy with my friend earlier. Instead, it talks about presence, and recall that in international shoe, the presence in that case was a bunch of salespeople who lived in Washington, carried out sales in Washington, and were served with process in Washington. So even if international shoe itself were the test or what it meant to be present, that wouldn't help Lilly in this case. They need to go all the way to the outer bounds of personal jurisdiction. Calder and Burger King, I think, are a good illustration of when a company might be subject or a defendant might be subject to personal jurisdiction. But you wouldn't say that they're present in the district. The defendants in Calder were not present in California, even though they were held to be subject to personal jurisdiction there because they had targeted a California resident with, in that case, defamatory conduct. Lilly's other argument is a structural one. They say basically that resides or is found, that those have to mean different things. We agree with that much. But it's certainly not necessary to give is found this unnatural, indeterminate meaning in order to give it some work to do in the statute because companies are found in lots of places where they don't reside, but that's not the same thing as saying that they are found everywhere the due process clause might permit. We recently, I think within the last two years, addressed found in connection with the immigration laws. This is the proper venue as to where somebody who comes back into the country after being deported and commits a crime where he's found. And we concluded, along with the Seventh Circuit, that found means where the person is, an existential notion. The Seventh Circuit, I think, said it's the person's being, where the person is. It gets to be a philosophical notion, but it probably parroted the Supreme Court's definition in the Supreme Court, I mean the antitrust cases where it is construed found to be where a person, a corporation has its agents. That's right. For a natural person, found often means that you're… A corporation has its agents. It's a natural person. It would be where the person is. So the real question is did Congress go beyond those types of concepts, in this case when it used the word found? Right. I think that's exactly the question, and I think that the antitrust cases that you just alluded to really strongly support our position because Congress took the trouble in the Clayton Act to broaden the antitrust venue provision from resides or is found to resides or is found or is doing business. And the Supreme Court said in the Eastman-Kodak case that that clearly means that is doing business is a broader concept than is found, that a company can be found in fewer places than it might be doing business because found is a narrower and more legalistic concept. In the United States v. National City case that the other side cited in its reply brief, the Supreme Court makes exactly the same point, that Congress broadened the antitrust venue provision precisely because it thought resides or is found was not broad enough for the remedial purpose that it had in mind in those statutes. Well, is it true that before 1978 did Black's Law Dictionary's definition of found require a corporation's physical presence within the judicial district? I wouldn't say physical presence of the corporation itself, Judge Floyd, but it did require its physical presence either personally or through an agent, and that agent might be appointed by statute. But that's right. There had to be someone within the district. Well, it's hard to talk about where a corporation is as an abstract notion. I suppose where it's incorporated could be where it is. But it seemed to me the Black's Law Dictionary definition had a special section that addressed corporations, didn't it? That's exactly right. It said that as applied to a corporation to be found, it is necessary that it be doing business in such state through an officer or agent or by statutory authority in such manner as to render it liable then to suit and to constructive or substituted service of process and to such an extent that actual presence is established. So the agent might not be the company's CEO. It could be an agent appointed specifically to receive service of process, but to be found in a district means to have someone in that district on whom process can be served. It could be an employee. It could be an agent. It could be an officer. It could be the Secretary of State if you're incorporated there. But it does not mean subject to personal jurisdiction on any of the broad theories the Supreme Court has adopted in cases like Calder. Lilly has not cited any dictionary that adopts that definition. I think the closest that they came was citing from the prior paragraph of the Black's definition, which deals with individuals, there is a line that says that it doesn't necessarily mean physical presence. But that's citing the Freeman case from the Supreme Court in which an individual left the district after the litigation was commenced. He'd already been served and he left the district. That's the curious thing about the site because he was present in Boston. Indeed he was. And he left. And, of course, jurisdiction attaches at the time of the commencement of an action. Right. And he tried to get out of the amended complaint by saying, I'm no longer in Massachusetts. And not surprisingly, the Supreme Court didn't countenance that. So the line in the dictionary saying that it doesn't necessarily mean physical presence, I think that, A, that's true for an individual, but, B, that is far from suggesting that. It's actually not true because it's inaccurate because it's a timing issue. The Freeman case, he was present and did not eliminate the need for presence. And the fact that he left after the suit was commenced didn't mean he was no longer present. I agree with that. But we have that doctrine today. Basically, jurisdiction is established at the time the suit is commenced. When we have diversity of jurisdiction, that's when we measure it. That's right. Now, I recognize that the Second Circuit did come out differently on this question, and I would like to address that just briefly. Now, it's important to note that these arguments that we've gone through today, Ms. Helm and I, were not really made to the Second Circuit. The argument in that case that the respondent was making was that is found only means tagged jurisdiction, and tagged jurisdiction doesn't work on corporations, so, therefore, corporations can't be found there. And the Second Circuit did not really parse the meaning of the word found. It doesn't cite any dictionaries, as the district court in this case pointed out. It just cited its own prior precedent, which said that 1782 is to be construed broadly. We don't have any quarrel with the idea that Section 1782 should be construed broadly, but the words in it have to be given their meaning, and there's no construction of the word found that goes to the full limits of due process. And the Second Circuit ultimately didn't have to confront that in that case because it ultimately decided that there weren't minimum contacts and the defendant or the respondent wasn't subject to personal jurisdiction anyway. So its construction of the statute was just an alternative holding. I'm not saying that it was dicta, but because it was an alternative holding, it wasn't subject to further review, and the Second Circuit didn't have to delve as deeply into these arguments, which, of course, it wasn't presented with in that case. Just touch very briefly on the other statutes that our friends have cited that they say have been construed this way. First, they're worded a little bit differently, but second and most importantly, they don't cite any case from before 1948 that gives it that interpretation, whereas we have the Supreme Court saying, as applied to a corporation, this is what resides or is found means. Unless the court has further questions on the statutory question, I would just like to turn in the alternative to why Novartis isn't subject to specific jurisdiction in this district. Ultimately, I really just want to make two points that my friend on the other side said today, something different than they said in their reply brief. In their reply brief, they said, I think this is page 18, that they are premising their jurisdictional theory on the filing and prosecution of these patent applications. Today, I think you heard something a little bit different, but ultimately I don't think that it matters because the prosecution of the patent applications in a federal agency in the Eastern District of Virginia is just not the purposeful availment of the benefits of the Commonwealth of Virginia in that district. And that is exactly what the Federal Circuit, which obviously has a considerable interest in the question of personal jurisdiction in patent cases and in the role of the patent office in it, in the Touchcom case that we cited, said that the Commonwealth of Virginia would not have personal jurisdiction over, indeed, over the law firm that was prosecuting patents, which was accused of malpractice in the prosecution of those patents. So there was no kind of germaneness issue in that case. But they said just essentially sending documents to a federal agency that happens to be located in Alexandria, Virginia, is not availing yourself of the benefits of the Commonwealth of Virginia. Now, in this case, there isn't even that same level of germaneness between these patent applications and the European litigation for which they claim to be seeking the discovery. But ultimately, I don't think the court needs to reach that if you follow what the Federal Circuit's reasoning and hold that just prosecuting patent applications before a federal agency is not sufficient. Well, Mr. Helm, I'm sorry, Ms. Helm says, you know, I don't think, well, she doesn't necessarily concede this, but maybe in isolation that may be true. But here, what we have here is sort of a concerted strategy by Novartis to stifle competition both overseas and domestically. And that's kind of the sufficient jurisdictional hook to make this discovery relevant and to amount to sufficient context to allow for the exercise of personal jurisdiction. I'm happy to address that, Judge Diaz. Novartis does not have any intellectual property in this portfolio in the U.S. You know, there's like no patent has issued. If a patent had issued, then they could be pointing to Section 293, which is the special long arm statute that applies to foreign patent owners. And they've tried to make use of that and to some cases that cite that. But it really only applies, one, to a patentee. In other words, someone who's actually gotten a patent, not an applicant. Two, someone who hasn't designated an agent for the service of process somewhere in the United States. And three, it's only for actions, sorry, for proceedings affecting the patent or rights there under. And so that's the kind of jurisdiction for which the Eastern District of Virginia is the ultimate backstop. When a foreign company gets a patent and someone wants to bring an action about the patent or rights there under, and they haven't specified somewhere else where that can be brought, okay, that can be brought in the Eastern District of Virginia. Now, that statute doesn't apply here because none of the three elements are met. But I think it really goes to your question. I mean, is that intended as a limitation or just an example of one method by which personal jurisdiction might attach? It is the only means by which the Eastern District serves as a sort of a backstop without the applicant's formal consent. In other words, you have the option to not obtain a patent. You have the option to, if you do obtain a patent, you have the option to designate an agent somewhere in the United States. Only if you don't do that is the Eastern District kind of forced on you as a place where you are required to subject yourself to suit. And then not for all purposes, not even for kind of, you know, purposes of, you know, European patents. It's only for proceedings affecting the patent, the U.S. patent or rights there under. And ultimately, a U.S. patent only has any effect within the United States. There's no such thing as a U.S. patent that can stifle competition overseas. And if they had a claim under a United States antitrust law, they could bring a claim under United States antitrust law. And the jurisdictional and venue reasoning would be quite different because under that statute, it's worded quite differently. But to say that these contacts, just pursuing patent applications in the patent office, gives rise to a sufficient jurisdictional connection with proceedings under European patents just because, I took this to be their point, that the European patent and the American patent applications were bought at the same time. And if that's the only connection, that's certainly not enough to say that continuing to prosecute the applications that you bought gives you specific jurisdiction. Well, I mean, not just bought at the same time, but they relate to the same drugs. Do I have that right? They relate to the same technology in a broad sense, I think. I want to be clear, though, that what Lilly has mentioned in its briefs and actually in the appendix pages that Ms. Helms cited, a U.S. patent that Genentech owned, Novartis at no point has owned that U.S. patent. It was not part of the transfer. So it's important to note that the patent that was successfully challenged in the United States, that was owned by Genentech, remained in Genentech's hands at all times. So we're only talking about applications that were assigned to Novartis remain in COE have not issued, have not resulted in issuance of any patents. And indeed, some of the applications that they have pointed to have been abandoned. So ultimately, so what that means, I think, is that even if the court were to adopt the other side's reading of the statute and hold that it goes to the complete outer limit of specific personal jurisdiction, they just haven't established specific personal jurisdiction here over Novartis in the eastern district. And I think that to hold that it that it did would raise some troubling implications, both for for patent applicants and really for federalism generally. There are the colloquial example that I can give you is that if you want to operate a Coast Guard licensed boat on the Chesapeake Bay, you have to get a license. And so where do you send your license paperwork? You send it to Falling Waters, West Virginia, because that's where the Coast Guard Documentation Center is. Don't think that you're purposefully availing yourself of the jurisdiction of West Virginia. If we find that there's no jurisdiction, do we have to worry about the intel factors? You do not, Your Honor. You can decide these these three issues in any sequence. So one is basically statutory jurisdiction, one's personal jurisdiction, and one is another threshold non-merits issue. So the court and the Supreme Court in cases like Sinachem has said that you can decide them in any order. And I think it certainly would make sense not to not to decide the intel factors if you don't feel that you need to. We've emphasized that as the third issue, in part because it is abuse of discretion review. And the district court is entitled to deference in deciding that even if it had this application properly before, it would not grant the request of discovery, in part because of the ability to get the discovery in Ireland, for example. Does Ireland have some level of discovery? Ireland does have discovery. And just within the last week or so, the High Court of Ireland has granted Lilly's application for some discovery. I know it did not grant everything that Lilly wanted. And Novartis has likewise sought some discovery in that action as well. And as far as in the briefing, there's some dispute about whether that could be used in other European proceedings. But I would just point you to Joint Appendix, page 258, which is an exchange of letters between Novartis' Irish counsel and Lilly's Irish counsel, in which Novartis agreed that at least one document produced very early in the Irish proceeding could be used in various other European proceedings. Can I ask about your client's activities here in the States in seeking discovery in Indiana, I believe? I mean, is that somehow an inconsistent position here? It's not, Your Honor. I certainly understand the question, and I understand why Lilly has sought to use it. But I think it's important to understand the timing of it. That application was filed only after the magistrate judge in the Eastern District of Virginia had denied our motion to quash. And so it appeared we were going to be subject to discovery here. So while we were pursuing review of that decision, Novartis filed a 1782 application in Lilly's home district basically seeking reciprocal discovery. Now, we filed a paper in that court before the magistrate judge on Friday of last week in response to a motion that Lilly had filed, in which we said specifically that Novartis would likely reconsider whether it needs to pursue U.S. discovery at all if it wins this case. So, in other words, we filed that application as a reciprocal application. If Lilly is not getting discovery from us, we would likely reconsider whether we need any discovery from Lilly in the United States. So it sounds to me like this litigation is going to keep lawyers busy for a while. It certainly is a complex dispute, but the U.S. part of it, you know, ultimately is just discovery. U.S. is to 1782 proceedings. Is that the U.S.? There is a third one in California, but that was discovery from Genentech, which actually is a U.S. company. And the only dispute remaining in the courts at that point is not about what will be produced, but about who has access to what's been produced. So I think that's not really relevant here. But it certainly is a complex dispute, but the U.S. portion of it is pretty narrow, and the question really is just whether Novartis should be forced to bring documents to the United States in order that they can be sent back to Europe for use in Europe and the limitations of 1782. Well, that goes to the intel factors. Yeah. It does, but it certainly, I think it underscores why the court should not permit discovery from a company that is not found in the district where the application is filed. All right. Thank you, Mr. Jay. Ms. Helm? Thank you, Your Honor. Just a few points here in rebuttal. So I think to begin with the dictionary point, doing business through an officer or agent or by statutory authority does not require a physical presence. And the line in Black's dictionary about not necessarily requiring physical presence, though for a natural person, was not needed for corporations, because corporations at the time were not required to be physically in a jurisdiction to be found there. We cite several of the other statutes, and opposing counsel ignores those statutes, including ones that were in the same bill at the same time of 1782, that interpret resides or may be found language to extend to the limits of personal jurisdiction. And all cases since the Second Circuit and the Del Valle case have fallen in line with that interpretation of found. Our opposing counsel cites a few district court cases pre-Del Valle that do not find that found extends to limits of personal jurisdiction. But those very districts, including the D.C. District, since then and since the Del Valle ruling, have reversed and said that they find the Del Valle ruling persuasive and have interpreted found in that way. And that's the D.C. District Court as well as two NDCal courts, which have also extended the ruling on extraterritoriality that was held by Valle. As to the evidence relating to the U.S. patent proceedings and how that's relevant to the European antitrust proceedings, I think I'll just pick up on a couple of points from Judge Diaz. I believe it's hard to see you, but you asked if this was not just if the basis for jurisdiction in EDVA, Lily was asserting, was not just the filing of patent applications. And you're absolutely right. And that also kind of dovetails with the whole clearinghouse argument. So I'd like to address that. Novartis changed their language from clearinghouse to magnet, probably because clearinghouse was used in Del Valle and that argument was lost. And in that case, the concern was sort of the same, that you're going to open these floodgates. Every major bank is in New York with a city full of good lawyers. Come here and get your discovery for use anywhere. And would this decision open unbridled access to documents for any foreign patentee that files U.S. patent applications? And that's absolutely not the case. This is an incredibly atypical and unusual situation, where the antitrust claims asserted are some of the more complex and in detailed than courts have seen in Europe. It's not the duty of the district court to have to delve into the merits of those claims. I remind you, this is, as you know, a discovery provision, not a liability provision. And I think that needs to be taken into consideration when thinking about the discovery that would be for use in the underlying litigation. And the point about Section 293, I believe, Judge Diaz, you also said that might be one example by which personal jurisdiction might attach. That's absolutely right. We really view Section 293 as the ilk of providing what's called fair warning of jurisdiction in EDVA. And that fair warning language is from Justice Kagan in the Ford case, and essentially amounts to the knowledge that a particular activity may subject that corporation to jurisdiction. And 293 provides for a vehicle to avoid that should they choose. They can file for an agent anywhere else they like. Novartis hasn't done that. So here, easy relief would be to designate an agent outside, and they did. Novartis also doesn't cite the definition of patentee itself in the statute, nor has Novartis cited a single case saying that 293 cannot encompass patent applicants. And the definition of a patentee under 35 U.S.C. 100D is not only the patentee to whom the patent was issued, but also the successors in title. And we did bring up the U.S. patent, which is an issue in the purchase agreement, because Novartis discussed being a successor in title to that patent, and has been a successor in title to the lineage of patent applications that are all related. And we submit that Novartis, by its own actions, as acknowledged before the California court, and now is in the record here, is treating these patent applications as they're acting like a patentee for them. And at least one case in the Ninth Circuit considered and relied on patent applications as a strong indicator of purposeful availment. And so, too, here, we believe. The Touchcom case, the Federal Circuit case, we believe is not apposite here. It was a very different case involving malpractice claims, and the concerns were different. We think 293 makes the best example by which personal jurisdiction might attach here. Tom, can I ask a question? I think I understood Mr. J to say that this appears to be a veiled attempt at seeking discovery in an antitrust case that has yet to be filed, and it's kind of like a ready-fire aim that you're looking for discovery for purported antitrust case using the mechanisms of 1782. Do you want to respond to that? Certainly, Your Honor. So one of the clear errors we believe the district court made here was ignoring the actual claims and defenses that are of record that have been pleaded extensively in the various foreign litigations. And as you know, from the last argument, I believe I listened to, one of you had mentioned that you're aware that foreign litigations are not like U.S. litigations and that they don't all have PACER dockets, and we can't just cite there are very extensive claims and defenses relating to anti-competition. But they do exist. They are of record. We have an attorney declaration from Lilly indicating that each of those jurisdictions has competition claims and defenses. They're very extensive. And furthermore, that each of those tribunals would be receptive to discovery information directly related to that to adjudicate those claims and defenses. And we don't think that the district court should have the burden of having to delve through those claims and defenses upon grant of an application. What the district court really needs to do is look to see, again, under Ford, whether there is a strong connection between the underlying litigation and the discovery that's sought. And all of the reasons that Novartis is raising for things like, you know, the burden and several of the intel factors, we submit are not the appropriate time now. This is under the federal rules of civil procedure. The appropriate time to deal with that would be, for example, in a motion to compel. And we had that at an earlier stage, and the parties had decided they were going to work out some document production, and that's of record as well. So clearly they had access to the documents if they were going to do that. All right. Thank you, Ms. Helm. We appreciate these very sophisticated arguments of both counsel. Our practice would be to come down and shake your hands, and we would very much enjoy that. But we're still following the protocols under the pandemic, and so we'll pass that. But we invite you all. Ms. Helm, we hope your circumstances improve, too. We invite you back to the court. It doesn't sound like this case is going to end very soon, so maybe some part of it stays here or goes somewhere. We'll see you again, though. Anyway, thank you for your arguments, and we'll adjourn court for the day.
judges: Paul V. Niemeyer, Albert Diaz, Henry F. Floyd